REDMOND *vs.* THE LIVERPOOL, NEW YORK AND PHILA-
DELPHIA STEAMSHIP COMPANY.

As respects water-borne goods, the general rule is well settled, that a de-
livery on the wharf, at a proper time, with notice to the consignee, dis-
charges the carrier.

Where the duties on dutiable goods are not paid, of necessity under the acts
of congress and the treasury regulations of the port of New York, made
pursuant thereto, the custom-house officers are the only persons authorized
to receive such goods on the wharf.

When they do so receive them, whether unladen in the day or night-time, the
liability of the carrier terminates.

APPEAL by the defendants from a judgment entered
upon the report of a referee.

This action was brought to recover the value of a case
of merchandise shipped on board the defendants' steamer
"*Edinburgh*," at Liverpool, England, in the month of
February, 1866, under a bill of lading given by the de-
fendants therefor. By this bill of lading the defendants
undertook to transport 23 cases of merchandise to New
York, and deliver the same at that port, to the plaintiff,
the consignee of said merchandise. These cases were
marked J. Y., and numbered from 1587 to 1609, consec-
utively. They were all delivered, excepting the one num-
bered 1609, which latter case was either lost from the
defendants' wharf or wrongly delivered, after being landed
from the vessel, and before the plaintiff had an opportunity
of receiving the same.

The facts of the case are stated in the opinion of the
referee, which acccompanies his report, as follows:

The *Edinburgh*, with a large miscellaneous cargo for
different consignees, including the 23 cases for the plain-
tiff, arrived at the port of New York on the 1st of March,
1866. She commenced discharging on the 6th of March,
at 10 A. M., and continued doing so until 6 P. M. Resumed
on the 7th, at 7 A. M., and continued until 6 P. M. On the
8th, began at 7 A. M., and kept on until 2 A. M. the next

day. On the 9th, from 7 A. M. until 3½ P. M., when, her inward cargo being discharged, she commenced taking in her return cargo. The invoices for the respective consignees were not discharged separately and distinctly, but the goods came out promiscuously and irregularly, as they were reached. According to the testimony of Mr. Mills, a clerk of the defendants, the 23 cases marked J. Y. came out of the ship on the 8th of March, but at what hour he does not state or specify. They were landed on a wharf or pier No. 44, North river, leased by the defendants, and used by them exclusively. After being landed, they were checked by Mr. Mills, acting in behalf of the ship, and also by a custom-house officer in attendance, whose duty it was to direct where the goods should be sent, in accordance with the entry previously made, and the permit granted thereon. The cases were entered for warehousing, and bonded warehouse No. 286 Water street was designated as the warehouse to which they should be sent. In addition to Mr. Mills, whose duty it was to check the cargo as it came over the ship's sides on to the wharf, in view of himself and the revenue officer, and whose supervision did not extend any further, the defendants had a delivery clerk, Mr. Whittaker, whose duty it was to superintend the delivery of goods to the cartmen who carried them away from the pier. Mr. Whittaker had been in the defendants' employment for several years, and was assigned to the responsible post which he filled on account of his experience. He occupied a little office outside of the gate, near the wharf. It was his general, if not uniform, practice to take receipts from the boss cartmen for the goods carted by them and their men as they left the pier. He was furnished by the defendants with printed blank receipts, which he filled in with the marks and numbers of the packages put on the carts, and to these he took the signatures of the boss cartmen and filed them away. Such a

receipt, dated March 8th and 9th, for twenty-two (22) of the twenty-three (23) packages, he produced on the trial. For the twenty-third case, No. 1609—the case in dispute— he had no receipt; Cole, the plaintiff's cartman, having denied that he or any of his men had ever received it. Cole was a duly authorized or badged cartman, and had for many years been in the habit of carting away from the pier goods consigned to the plaintiff; he was recognized by all parties as the person who was entitled to take charge of the plaintiff's cases, and no one interfered with the performance by him of that duty. The mark J. Y. was a well known mark of the plaintiff's goods, and the exclusive right of Cole, as the plaintiff's representative, to cart packages of that mark, was conceded by Brewer, an official custom-house cartman, and by all other parties on the wharf and about the ship.

The referee found that, upon the arrival of said vessel, the defendants only delivered twenty-two of said boxes so received by them at Belfast, and failed to deliver the remaining box of merchandise to the plaintiff. That the plaintiff paid to the defendants the freight so required to be paid on the said twenty-three boxes of merchandise. That the value of the box of merchandise which the defendants failed and neglected to deliver to said plaintiffs was, on the 27th day of June, 1866, the sum of $976.88. And that the plaintiff was entitled to recover that sum, with interest and costs, of the defendants.

Judgment having been entered upon the referee's report, the defendants appealed.

*J. W. Gerard, Jr.,* for the appellants.

I. The legal obligations of a carrier by water, of ocean borne goods, are not the same as those of a land or inland water carrier, but are as follows: 1st. To give reasonable notice of the arrival and unlading of the vessel. 2d. To deposit the goods at the usual wharf, or at some other

proper place.    3d.  The goods thereupon, when discharged on the wharf, are considred as legally delivered, and the carrier's further responsibility for their care is removed. The above principles of commercial law are established in the following cases, and was the recognized law and custom of the port.    The contract is merely to carry from port to port, not to be storekeepers or land carriers.    (*The ship Grafton, Olcott's Admiralty Rep., Betts, J.,* 43.    *Field* v. *Lovett Peacock.*)    See also opinion of Betts, from manuscript Book of Decisions, No. 27, p. 49; in which case, Betts, J., held that even a purloining of a part of the cargo by an officer of the ship after it was delivered on the wharf, would not render the ship liable.    (*Kennedy* v. *Dodge,* 1 *Ben. Dis. Court Rep.* 311.    *Cope* v. *Cordova,* 1 *Rawle, Penn. Rep.* 203.    *Edwards on Bailments,* 532–4.    *Story on Bailments,* §§ 544, 545.    *Richardson* v. *Goddard,* 23 *How. U. S.* 28.    *Angell on Carriers,* §§ 310, 311.    *Northern* v. *Williams,* 6 *La. Rep,* 578.    *The Norway, reported* 12 *Law Times, N. S. Ely* v. *New Haven Steamboat Co.,* 53 *Barb.* 207.)    The cases quoted by the plaintiff contrary to these principles, have relation solely to goods carried by rail or on inland water, and have no application to ocean carriers.    The above being the established law as well as the commercial usage of the port, the defendants' liability for this case was removed, after knowledge of the time of arrival and discharge of the vessel was brought home to the plaintiff, or to the custom authorities, who the plaintiff, by entering the goods in bond, thereby delegated as his substitutes to receive and care for the goods.    Such knowledge was brought home.

II. Although the above delivery at the defendants' wharf, after notice brought home to the consignees, or their delegates, was a sufficient delivery in law, the defendant has gone further, and proved an actual physical delivery of all the cases to the custom-house receivers on the wharf, whose duty it was by law to receive goods on which duty

had not been paid. This testimony is not contradicted or disputed, and must be assumed as absolutely true.

The treasury regulations, being made under laws of the United States, are part of the law of the land and custom of the port, and as such are presumed to be known to the plaintiff, an importing merchant. (*Redfield on Carriers*, § 219.) These laws and regulations make the custom officers the legal custodians of the goods from the time of their being placed on the dock; and possession is to be immediately taken by them, and held until the duties are paid. The plaintiff, by electing not to pay the duties, delegated the right to the United States as his agents, under the law, to receive the goods, and delivery to them was delivery to him. The United States officers, therefore, and not the defendants, are bound to account to him after delivery to them. (*Laws of U. S. of Aug.* 6, 1846, *vol.* 9; *U. S. Stat. at Large, p.* 53. *Law of March* 28, 1854, *vol.* 10, *p.* 270. *Vide printed Rules and Regulations,* §§ 7 *and* 9, *established by the treasury, under authority of the law of March* 28, 1854, § 9; *vol.* 10, *U. S. Stat. p.* 273. *Harris* v. *Dennie,* 3 *Peters,* 292.)

III. The parties' legal rights and positions being as above, and the defendants' liability as carriers entirely removed, no negative action of an employee of the defendants (Whittaker) in not getting a receipt, could interfere with the above status, or restore the liability of the company when once removed.

The singular fallacy of the plaintiff's argument below is, that because we cannot exhibit a receipt for this case *nominatim*, there could have been no delivery; and if from error, mistake or accident, no receipt was got, there was no delivery; and *ergo*, the defendants are liable for the subsequent acts of others, and are precluded from showing a delivery to the proper persons. There is neither law nor logic in this. The answers are: 1st. A receipt is nothing but a piece of evidence, constituting only presumptive

evidence of delivery, generally obtained for convenience of proof. 2d. This employee, Whittaker, at the defendants' gate, it seems took all the receipts he could get, although he and the general agent, Dale, say he had no directions to get receipts for bonded goods, and it was the exception, not the rule, to get such receipts. Whittaker always tried to get them, however, from the custom's carrier, as well as from others, for greater convenience for all parties, and as an additional means of tracing goods. These receipts were given, sometimes, days after the first goods were taken away; in this case, on the 9th, the day after they were taken away. The mere fact of his getting it or not, neither establishes or removes a liability. The plaintiff fallaciously avoids the main issue, i. e., delivery, and tries to turn the case into a false issue, i. e., a receipt after delivery, which is immaterial.

IV. Another curious ground of the plaintiff's claim is, that the plaintiff had a right to suppose that, as our employee generally got receipts, he would get one in this case, and so protect the plaintiff. The answers are: 1st. Protect him against whom? the acts of his own, and the government agents, i. e., the custom authorities, and the custom cartmen? But those people were, in law, his, plaintiff's agents, and their acts were his acts, as far as we were concerned. 2d. He had no right to rely that we should stop the government cartmen and get receipts from them, when, as an importer, he knew that we had no right to stop them, as they had their orders from the government officers and receipted to them on the wharf, for bonded goods. 3d. The plaintiff here could not have been misled; he relied exclusively on the United States for protecting and receiving his goods. He says, "I know nothing as to who took these goods to the public stores," showing that he exercised no care or supervision over the matter after the permit was put in Cole's the cartman's box, but relied on the government receiving and trans-

porting the goods through their officers and cartman, Cole. 4th. Getting a receipt would not have protected his goods, as these receipts were often given several days after delivery; in this case, the day after some had been taken away, and the receipt in this and other cases were usually signed by the boss cartman, after his employees had taken them away. The receipt, therefore, would not operate as a check, but as evidence only.

V. As a test of the fallacy of the plaintiff's position we will ask, if we were not right in delivering to the custom authorities on the wharf, (as it clearly appears we did,) to whom could we legally have delivered? 1. Not to the plaintiff, certainly, or his employee, for that would have been illegal, and would have caused forfeiture of the vessel and of the goods for smuggling, i. e., secretly delivering goods, not duty paid, to consignees in fraud of the revenue. The consignee, therefore, had no right to touch them. Inasmuch as it was our duty then to deliver to the United States authorities, does it make any difference whether the goods were delivered to them on the wharf, or outside the wharf, on the public highway, as the plaintiff seems to claim? 2. Neither could we deliver to the warehouse, for we were not an express company, and the permit was not delivered to us, nor were we to judge of its validity. 3. Nor was it our duty to look up or deliver to a custom-house cartman, for we were not the persons to judge of his authority, or the validity of his permit. But we did deliver to the proper person, i. e., the representative of the collector on the wharf, whose duties were not those of a mere inspector, but a receiver, a designator and distributor of the goods, and the person to select and order the cartman, and pronounce upon the validity of his permit.

*Henry Nicoll,* for the respondent.

I. The referee has found as matter of fact, that there was *no actual* delivery to the plaintiff of the case of merchan-

dise in question, and the finding in this respect is abundantly sustained by the evidence.

II. The facts of the case wholly fail to establish a *constructive* delivery. Where such delivery is relied upon to relieve a common carrier from his responsibility, it must appear that the consignee has not only had notice of the readiness of the carrier to make delivery, but he must also have had full opportunity for providing means of removing his goods or of putting them under proper care or custody. In *Richardson* v. *Goddard,* (23 *How. U. S. Rep.* 25,) Mr. Justice Grier, who delivered the opinion of the court in that case, lays down the rule in this respect, as follows: " He (the carrier) is not bound to deliver at the warehouse of the consignee; it is the duty of the consignee to receive the goods out of the ship or on the wharf. But to constitute a valid delivery on the wharf, the carrier should give due and reasonable notice to the consignee, so as to afford him a fair opportunity of providing suitable means to remove the goods or put them under proper care and custody. Such a delivery, to be effectual, should not only be at the proper place, which is usually the wharf, *but at a proper time.* A carrier who would deposit goods on a wharf at night or on Sunday, and abandon them without a proper custodian before the consignee had proper time and opportunity to take them into his possession and care, would not fulfill the obligation of his contract." (*See also Ostrander* v. *Brown,* 15 *John.* 39; *Gibson* v. *Culver,* 17 *Wend.* 305; *Fisk* v. *Newton,* 1 *Denio,* 45; *Gatliff* v. *Bourne,* 4 *Bing. N. C.* 321; *Benson* v. *Blunt,* 1 *Adol. & Ellis, N. S.,* 270; *Norway Plains Co.* v. *Boston and Maine Railroad,* 1 *Grey,* 263.)

III. Applying the principles which are established by the cases cited under the preceding point, to the facts of the present case, it is established that there has never been any constructive delivery of the package of merchandise in question. The notice of the commencement of the un-

loading of the vessel, given at the custom-house and in the newspapers, was for the purpose of enabling consignees to make the necessary entries and procure *permits* for the landing of their merchandise. . This notice was ineffectual to relieve the carrier from his responsibility, because, under the course and practice of the defendants' business in discharging merchandise from their steamships, the consignee, with the utmost diligence on his part, could not know when his goods would be landed on the defendants' wharf, nor, when landed, could he take any measures for their protection. The defendants' steamships arrive at, and sail from, this port every week. The utmost dispatch is required to discharge and reload them. The work is carried on day and night. In the present case the *Edin-burgh* commenced discharging her cargo on the 6th of March, at 10 o'clock A. M., and the work continued until 6 o'clock P. M. of that day. On the next day it was re-sumed at 7 o clock in the morning, and continued until 6 o'clock in the evening; and on the 8th (the day on which the missing case is alleged to have been landed) the work began at 7 o'clock in the morning; and was continued until 2 o'clock A. M. of the next day; on which day, at 3 o'clock P. M., the discharging of the cargo was finished; the vessel took in her return cargo, and sailed for Liver-pool on the 10th of March. It will not be pretended that this was an exceptional case ; on the contrary, it may be safely assumed that it was the ordinary way in which the defendants were compelled to act by the exigencies of their business. By reason of the necessary haste in which the cargo had to be discharged, the packages of goods are landed with great irregularity. The missing case came out of the vessel some time on the 8th of March, but at what hour—whether during the daylight or in the night time—does not appear. Terhune, the cartman, went to the wharf for the plaintiff's cases on the morning of that

day, and was told there were no more out, and he got none.

IV. For the reasons above given, it is apparent that it would be most inconvenient for the mercantile community if it should be adjudged that the ship owners' liability in such a case is at an end, *eo instanti*, with putting the merchandise over the ship's side, the packages coming out of the vessel with irregularity, and the consignee being wholly unable to conjecture when any part of his own merchandise will be landed. If such should be the rule, the consignee must not only be present with his clerks and cartman, to take the merchandise in charge the moment the work of discharging is commenced, but he must remain there until the work is completed.

V. It is fully established by the defendants' own witnesses, that an organized system of delivery from the defendants' wharf has been in existence for many years. Its object is to save the defendants from liability, by requiring all deliveries to be made through a delivery clerk, who takes receipts from the cartmen for the merchandise delivered to him. Exhibit No. 4, being the receipt which was given in this case, clearly shows by its language that the defendants understood that the delivery which they were required to make, should only occur when they had placed the goods in the hands of the consignee's cartman. The receipt is as follows: "Received in good order, *from on board* the steamship *Edinburgh*, the following packages consigned," &c. Consignees of merchandise by these steamships are therefore fully justified in accepting the defendants' interpretation of the contract as a protection, for it is wholly inconsistent with the assumption that the goods are at the risk of the consignee directly they are over the ship's side. Having been acted upon for so long a time, it cannot now be disavowed without manifest injustice, for it is obvious that if the plaintiff had been apprised in time of the defendant's intention to insist upon

the strict exemption from liability which is now claimed by them, he would have taken measures to insure the safety of his property.

VI. No fault or *laches* can be imputed to the plaintiff, and it will be observed that when he made a demand for the missing case from the defendants, it was assumed by them that they were responsible for its loss.

VII. There is no foundation for the position taken by the defendants, that there was a delivery of this case into the hands of the custom-house inspector, who was detailed by the collector of the port to superintend the discharge of the vessel. By the act of congress, and the regulations of the treasury department, the inspector who is placed in charge of a vessel is required to see that no package is landed without a *permit* from the custom-house. On this permit it is required to be stated where each package is to be sent; in the case of dutiable goods, to a bonded warehouse, or general order warehouse; and where the goods are free of duty, or where duties have been paid, to the consignee. The inspector has no further or other duties. He attends on behalf of the government, and his sole business is to prevent any package from being improperly landed. Where goods are directed to be sent to a bonded warehouse, the delivery to a cartman duly authorized to take them to such warehouse will alone discharge the carrier's liability. (*U. S. Stat. at Large, vol.* 1, *p.* 667. *U. S. Treasury Regulations*, §§ 622, 623.)

VIII. In answer to the argument of the defendants' counsel, that where goods are entered for warehousing, the carrier is discharged from responsibility as soon as each package has passed and been checked by the inspector under whose superintedence the cargo is discharged and has been put upon the dock.

The argument proves too much; for the delivery *of all merchandise* from a foreign vessel is as much in charge of the inspectors as that of goods intended for a bonded

warehouse. The duties of an inspector in this respect are regulated by law. (*See act 7th March*, 1799, § 53; *U. S. Stat. at Large, vol.* 1, *p.* 667; *Regulations of the Treasury Depart. p.* 344, §§ 620, 621, 622.) By these provisions it will be seen that the surveyor of the port is directed, immediately on the arrival of a ship from a foreign port, to place an inspector on board, under whose inspection all the goods on board are to be *delivered from* the vessel. No goods, free or dutiable, can be discharged without a *permit* or *general order* from the collector or naval officer directed to and delivered to the inspector. Where free, or where duties have been paid, the permit does not designate to what place the goods are to be sent, but in all other cases the public store, appraiser's office or bonded warehouse is mentioned in the permit. The permit is in all cases given to the inspector on board. That officer has no discretion whatever as to where the goods are to be sent.

If, therefore, the delivery under the direction of the inspector is such a delivery as terminates the carrier's responsibility, it must apply to all goods which come out of the ship, and are deliverable only under these permits. As to warehouse goods, the inspector has really nothing more to do than in respect to other goods. Warehouse goods must be carted by certain cartmen authorized to do so by the collector, and are taken by them to the warehouse designated in the permit. (*Treasury Regulations,* § 436.) The officer in charge of the warehouse signs a receipt specifying marks and numbers of packages, which is returned to the inspector on board the vessel. All these provisions of law are intended for the sole purpose of securing the collection of duties or preserving the lien of the government for the same, but for no other purpose, and they cannot affect or in any way diminish the responsibility of the carrier.

Assuming, as we contend, that the carrier's responsibility does not cease until the consignee has had a reason-

able opportunity to take away his goods, there is no ground for holding that a different rule should prevail where bonded goods are landed; there is as much danger of their being lost or purloined as of other goods. They come out with the same irregularity from the ship, and at all hours of the day and night, and there is no reason why the carrier should not be held to as strict accountability for these as other goods. In respect to these warehouse goods, the collector is, in fact, so far as the carrier is concerned, the consignee's agent, and if he has not had the opportunity of taking away the goods and they are lost, why should not the carrier's responsibility continue?

As has already been observed, the ship owners choose their own time for the unloading of the cargo; all that the inspector has to do, is to see that none of the cargo is landed without a permit; at any rate, whatever may be his duties, they apply as well to all other merchandise on board, as to warehouse goods. Suppose a case intended for warehouse comes out in the night, when it cannot be sent to the warehouse; it seems extremely unreasonable to say that in such a case the carrier should not be responsible for its safe keeping until there has been an opportunity to cart it away to the warehouse.

For all these reasons, it is submitted that the attempt now made to withdraw bonded goods from the operation of a practice which it is impliedly admitted prevails in respect to all other merchandise, rests on no solid foundation. An analysis of the evidence will show that no such difference exists in point of fact, and that all goods are delivered from the defendants' steamers upon receipts signed by the cartmen and taken by the defendants' delivery clerk. In this very case, all these bonded J. Y. cases were carted by Cole, who was required by Whittaker to sign, and did sign, the receipt, which is in printed form, and is the same receipt used by the defendants for merchandise delivered by them. Whittaker was as much

Redmond *v.* Liverpool &c. Steamship Company.

on the alert in looking after these bonded J. Y. cases as any other, and the letter by Craig, in behalf of Dale, is a virtual admission that no such distinction existed between warehouse and other goods. This theory of excepting warehouse goods from the operation of this practice is the growth of a later stage of the case. Dale, when first called as a witness, does not allude to it, either on his direct or cross-examination. When recalled, he states that it was the general rule to take receipts upon the delivery of goods. Free goods had receipts invariably taken, others not invariably taken; only taken to trace the goods if gone astray. He says that it may have occasionally been done in case of bonded goods, but he is unable to state any instance in the case of the *Edinburgh,* when it was not done, and he does not know or believe that any was delivered without taking receipts. Whittaker, neither on his direct or cross-examination, makes the slightest allusion to any difference in his action between bonded and other goods. It is true, Mr. Schwerin, the agent of one of the Bremen lines, testified, on his cross-examination, that it was not the practice of his company to take receipts for bonded goods; but even if this were so in the case of that particular line of steamers, it is not sufficient to prove a usage, or to overcome the testimony in this case, that a contrary practice prevailed with the defendants. Moreover, this witness expressly states that great despatch was not used by his line in loading and unloading cargoes.

It is worthy of observation, that the defendants, if the fact were so, might have shown by their books what goods were imported by the *Edinburgh* and sent to bonded warehouses, which they did not receipt for.

These views of the case, it is submitted, are sufficient to show that the distinction attempted to be made between bonded and other goods has no reasonable foundation, and further, that the evidence, so far from sustaining it, proves the reverse.

GEO. G. BARNARD, J. The general rule is well settled, that a delivery on the wharf, at a proper time, with notice, discharges the carrier of water-borne goods. (*Ely* v. *New Haven Railroad Company*, 53 *Barb.* 207.) Justice BRADY is of the opinion that this case is an exception to the rule, because he considers the case of goods in controversy was discharged in the night-time. I cannot find that the referee finds any such fact specifically. I think, also, if he had so found, it would have been against the clear weight of the testimony, which, according to my understanding of it, shows the delivery to have been in the daytime.

Besides, the case in question contained dutiable goods, which were not paid. Of necessity, under the United States statutes and treasury regulations in evidence, the custom-house officers were the only persons authorized to receive such goods on the wharf.

There is no dispute but that they did receive this case, whether unladen in the day or night-time; and with its receipt by them, in my opinion, the liability of the defendants terminated.

I think the judgment should be reversed, and a new trial ordered, with costs.

INGRAHAM, P. J., concurred.

BRADY, J., (dissenting.) Twenty-three cases of goods were consigned to the plaintiff, and sent from Liverpool by the steamer *Edinburgh* to this port. The general clerk of the plaintiff made out the custom-house entry for the goods, had them entered, and obtained a permit to send them from the steamer to the public warehouse. He put the permit in the box of Cole, a custom-house cartman, authorized by his license to cart goods to the warehouses, and there to leave them. The twenty-three cases were delivered from the steamer on the 8th of March, 1866, but

Redmond *v.* Liverpool &c. Steamship Company.

one of them was lost or stolen, the rest having been safely deposited in the warehouse designated for their reception. The warehouses are places of deposit established by law. When one of the defendants' steamers arrives, it appears from the evidence, that an inspector of the customs attends the vessel, to pass the goods from her to the defendants' wharf upon permits therefor, obtained at the custom-house, and to designate whether they shall be delivered at once to the consignee, which may be done if the duties have been paid, or be sent to the general order store, which may be done when the goods have not been entered, or be sent to a bonded warehouse, which may be done when the goods have been bonded and entered for warehousing. This system is predicated of acts of congress, hereafter referred to, and the regulations of the treasury department authorized by them. The inspector, in the discharge of his duty, takes the numbers and marks of the packages as they pass out of the vessel, and the practice of the defendants was to check each package also, at the same time; a duty performed by a clerk assigned for that purpose. When the goods are thus passed, they are separated, each class being kept by itself, goods on which the duty has been paid, goods for the general order store and bonded goods for bonded warehouse. When this is done, a different class of persons appears, namely, custom-house cartmen, acting by appointment of the collector, and under official oath and bonds for the faithful discharge of their duties, and they take charge of the goods for delivery, which are to be placed in general store or bonded warehouse. It would seem to be proved that of these cartmen some have charge of a district embracing certain wharves, and the one having charge of the district which includes the defendants' wharf, takes immediate control of the public store goods, and general order goods, and of the bonded goods for bonded warehouse, unless some other cartman demands the latter, having been selected therefor

by the consignee, or otherwise. From these cartmen it was the practice of the defendants to take receipts for goods carted away by them, but not always for bonded or warehouse goods; and it does not appear to have been the custom to take receipts for such goods by other companies. It has already been stated that the permit for the plaintiff's goods was placed in the box of one Cole, a licensed or appointed cartmen, and that gave him the right to take possession of the goods and transport them to the warehouse named. He took twenty-two cases only, and the referee finds that the other case was not delivered to the plaintiff, and it does not appear to have been delivered formally to Cole or his assistants. The right to take possession of the whole consignment was undoubtedly yielded to Cole by the district cartman, and there can be no doubt that it was all discharged from the vessel, although the referee does not find the fact. It appears to have been the duty of the district cartman to report himself at the vessel as soon as the defendants commenced to discharge her. And it also appears that he was at his post, and that the plaintiff was notified of the arrival of the vessel, and had the opportunity to pay the duties, or bond the goods for warehousing, or to adopt any course with reference to them that he might think proper. He entered them as already stated, and obtained a permit to have them sent to a warehouse. Upon these facts the question presented is whether the defendants are responsible for the lost package. These goods were landed on the defendants' wharf, according to the testimony of one of their clerks, on the 8th of March, as already stated, but at what time of the day does not appear. The discharge of the vessel on that day was commenced at 7 A. M. and continued until 2 A. M. of the 9th, the day following; and it may be that the case lost or stolen was discharged after daylight, and if so, it could not be taken into the warehouse until the next day, it appearing that such is the rule. Assuming, therefore,

Redmond v. Liverpool &c. Steamship Company.

that the defendants' duty as a carrier may be discharged by landing the goods on the wharf after the proper inspection of them, where the consignee has determined by his entry that they shall be placed in a warehouse and taken thence by the person authorized to convey them thither, yet there is an insurmountable barrier to the success of such a defense in this case. The discharge must take place at a reasonable hour, sometime during the daylight, if not at such time of the day as will enable the cartman with due diligence to transport the goods to the place designated. (*Richardson* v. *Goddard*, 23 *How. U. S. Rep.* 39; *opinion of Justice Grier. Story on Bailments*, 6th *Am. ed.*, § 545.) If the carrier, for his own convenience or advantage, places the goods upon the wharf, whether his own or that of another, at unseasonable hours, he must assume all the consequences that ensue; the consignee is under no obligations, either personally or by agent, to attend the place of delivery after the usual working hours of the day, in the absence of some custom, or usage or contract binding him so to do. There is, it is true, some evidence in this case that the goods were unloaded during the daytime and carted away by the plaintiff's cartmen or his assistants, but the evidence is conflicting, and the finding is against the defendants on that subject.

It is no answer to this view, that the system or mode of landing is such that bonded goods for bonded warehouse may pass to the possession of the revenue officers of the government. If the goods had been destined for any public warehouse, owned or leased by the United States, (*see Act of March* 28, 1854, 10 *Stat. at Large*, 270, § 1,) in which they may be deposited when bonded according to law, it might be held that it became the duty of the collector of this port to take possession of them and to deposit them, as required by the act of August 6, 1846, (9 *Statutes at Large, p.* 53,) but these goods were to be sent

to a bonded warehouse approved by the secretary of the treasury, and placed in charge of a proper officer of the customs, who, together with the owner and proprietor of the warehouse, shall have joint custody of the merchandise received. (*Act of* 1854, *supra*, § 1.)   The possession is therefore divided between the government and the owner of the warehouse, and the consignee has the right to select the cartmen who shall convey his goods to the warehouse. It is true that by the regulations of the treasury department, established by authority of acts of congress, the cartmen are to be appointed as already stated, and that such regulations declare it to be intended that bonded goods shall at all times be in the custody of the officers of the customs or their authorized agents.   (*Treasury Regulations,* §§ 7, 9.)   Nevertheless it is apparent that these regulations relate to the lien of the government which they are design- ed to protect and secure, while the right to select the cartman, conceded by the government to the consignee, undoubtedly makes him the agent of the latter, and a delivery to him in any proper form a protection to the carrier.   The defendants are not entitled to the benefit of the laws governing the transportation of goods from the wharf to the warehouse, unless they have, in the perform- ance of their duties as carriers, discharged their obligations beyond doubt.   It will not be so regarded when the goods they carry are placed upon their wharf after the working hours of the day shall have expired, and more particularly when the place of deposit being named, and to which they must be conveyed, and which he has not the power to change, is closed, for the time being, against the con- signee.   The dispatch necessary to a successful prosecu- tion of the defendants' enterprise may require the discharge of their vessels at unseemly hours, but if it does, and the defendants act upon the necessity, they must bear the burden.   They can protect themselves by proper means

Redmond *v.* Liverpool &c. Steamship Company.

from any disadvantages.  The onus of establishing a proper delivery rested upon them.  They assume to have done so, by proving a compliance with the revenue laws, the effect of which was, they claim, to transfer the possession and responsibility to the officers of the customs, but I am not able to declare that result to have been attained.  The defendants have not shown that they delivered the goods in question to the plaintiff or his agent, or to any person authorized by law to receive them, to the exclusion of the plaintiff, who accepted them and assumed the responsibility of their custody.  There is no charge of laches or negligence against the plaintiff or his cartmen, arising from absence from the defendants' wharf during the proper hours for the unloading of the vessel, and the case presents, therefore, an abstract question of the defendants' liability upon the facts disclosed and considered.  The consignee is entitled to consideration.  He may select the cartmen and the place of deposit, but he must execute a bond to acquire these privileges, and should not be compelled in addition thereto to accept as a full discharge of the carrier's duty and liability, a delivery in strict formal accordance with the revenue laws and regulations, but not in harmony with that responsibility and duty which the common law imposes upon them.  But, if otherwise, then it is not unreasonable to require from carriers that they shall, in the discharge of their freight, as between them and the consignee, conform to the rules of the revenue system which prevails in relation to such discharge and the disposition of the property carried, with which their agents are familiar, and which would require its delivery during daylight.

The result of these considerations is, that it not appearing conclusively in the case that the package in question was landed upon the defendants' wharf during daylight, it was not properly delivered, and the defendants are respons-

ible.   What would be the result of this investigation if it had been established that the goods were landed at a proper time of the day, and while the cartman of the plaintiff was present, or ought to be, it is unnecessary to state.

I think the judgment should be affirmed.

New trial ordered.

[NEW YORK GENERAL TERM, April 4, 1870.   *Ingraham, Geo. G. Barnard* and *Brady*, Justices.]